BLUE VIEW CONSTRUCTION, INC. *vs.* TOWN OF FRANKLIN
& another.[1]

No. 06-P-876.

Norfolk. April 5, 2007. - October 3, 2007.

Present: DUFFLY, COWIN, & McHUGH, JJ.

*Subdivision Control,* Planning board, Approval of plan. *Eminent Domain,*
What constitutes taking. *Real Property,* Easement. *Easement. Estoppel.*

.

In a civil action, the judge properly found that action by the defendant town's
   zoning board of appeals under G. L. c. 40B with respect to a proposed
   development of land by an abutter to the plaintiff's property did not violate
   G. L. c. 41, § 81W, and did not constitute a constructive taking of the
   plaintiff's property, where the plaintiff had abandoned the previously
   approved subdivision plan for its property on which its claim of a violation
   of § 81W was premised, and therefore, the town could not be precluded
   from authorizing alternative development plans; however, even if it could
   be said that the plaintiff had not abandoned its subdivision plan, § 81W
   has no effect on a zoning board of appeals and in no way limits its author-
   ity under G. L. c. 40B. [351-354]
In a civil action, the judge properly concluded that the plaintiff property
   owner had not acquired an easement by estoppel over an abutter's property
   for the purpose of providing frontage for the development of seven lots on
   the plaintiff's property, where general principles of estoppel are not applic-
   able to the creation of easements. [354-356]
This court denied a request for attorney's fees on appeal where the appeal was
   not frivolous. [356]

CIVIL ACTION commenced in the Superior Court Department on
December 6, 2001.

The case was heard by *Judith Fabricant,* J.

*David J. Fine* for the plaintiff.

*Michael P. Doherty* (*Maria R. Rockwell* with him) for the
intervener.

*Mark Bobrowski* for the defendant.

COWIN, J. The plaintiff, Blue View Construction, Inc. (Blue
View), claiming to have been frustrated in its efforts to subdivide

[1]Marinella Development, LLC, intervener.

and develop certain of its property in Franklin (town), brought this action against multiple defendants on various theories. When the smoke had cleared for trial, the case had reduced itself to two claims: (1) a claim against the town alleging that action by its zoning board of appeals under G. L. c. 40B with respect to a proposed development by an abutter violated G. L. c. 41, § 81W, and constituted a constructive taking of Blue View's property, thereby entitling Blue View to damages; and (2) a claim against the defendant, the abutter Marinella Development, LLC (Marinella), that Blue View had acquired an easement by estoppel over Marinella's property for the purpose of providing frontage for the development of seven lots on Blue View's property.[2] A judge of the Superior Court determined that approval of Marinella's G. L. c. 40B application did not violate Blue View's rights under G. L. c. 41, § 81W, and that Blue View did not have the benefit of an easement by estoppel over Marinella's land. We affirm.

1. *Background.* Many of the underlying facts are not contested. Others that we set forth are based on permissible findings of the trial judge, certain of which are the product of credibility determinations. The judge's comprehensive findings of fact give a complete history of the dispute.

Blue View, whose president and sole stockholder is James Chilson, acquired approximately twenty acres in the town in 1984. That property abutted approximately forty-four acres then owned by Joseph and Carole Loycano. Blue View subdivided a portion of its land into eight buildable lots on approximately twelve acres, each of the lots fronting on Populatic Street.[3] Because the eight lots included all of the street frontage, Blue View was left with a landlocked area behind the eight lots designated "Parcel A." Parcel A, which abutted the Loycanos' property, was shown on the recorded subdivision plan as not being a buildable lot under the town zoning by-law.

On October 22, 1984, Blue View sold the eight buildable lots to Hyper Realty Trust (Hyper), a nominee trust in which Chil-

---

[2]Alternative theories that an easement had arisen by necessity or implication were abandoned by Blue View during the course of these proceedings.

[3]Blue View's subdivision plan was endorsed "Approval not Required" by the town planning board on March 2, 1984.

son and two business associates each held a one-third beneficial interest. Hyper reconfigured the lots, constructed houses, and eventually sold the improved lots for a total of $1.8 million. Blue View continued to own Parcel A, which remained landlocked. Chilson and Joseph Loycano discussed a possible sale of the Loycanos' abutting property to Blue View on several occasions, but were unable to agree on a price.

On December 20, 1985, the Loycanos entered into an agreement with Marguerite Building Corporation (Marguerite) whereby Marguerite acquired the right to purchase and develop the Loycanos' property. On August 25, 1986, Blue View, Hyper, and Marguerite entered into a memorandum of understanding whereby the parties agreed to submit for approval a joint subdivision plan for a project to be called "Populatic Heights." Pursuant to the plan, Marguerite would construct a road (White Stone Road) that would run from Populatic Street across one of Hyper's lots (lot 8B) in such a way that it would provide frontage for Blue View's Parcel A sufficient to permit the creation of seven buildable lots on that parcel. As part of the transaction, it was agreed that Hyper and Marguerite would own lot 8B jointly, and Blue View would convey to Marguerite one of the seven proposed lots in Parcel A.[4]

In accordance with the memorandum of understanding, Blue View and Marguerite in 1987 submitted a subdivision plan, which was approved by the town planning board and recorded. However, for reasons that are not clear from the record, the plan as submitted and approved showed the proposed White Stone Road not in its intended place abutting Blue View's property (and thus providing frontage for Blue View's proposed lots), but rather located entirely within the Loycanos' land, about ten feet from the Blue View property. Notwithstanding Chilson's testimony to the contrary, the judge found that neither the Loycanos nor Marguerite had ever agreed to convey the intervening ten-foot strip to Blue View.

With authorization from the town zoning board of appeals, Marguerite undertook the removal from the Loycano property

---

[4]This conveyance was intended to compensate Marguerite for its loss of a lot on its property as a result of the location of the proposed White Stone Road.

of enough loam and gravel to prepare the site for the construction of White Stone Road. However, Marguerite removed more material than what the removal permit allowed, including some material from Blue View's property. This left the Loycano and Blue View properties sufficiently uneven that the authorized Populatic Heights project proposed by Blue View, Hyper, and Marguerite could not be constructed without regrading the affected properties. There has been no further work on the project and there have been none of the conveyances called for in the August 25, 1986, memorandum of understanding. Meanwhile, by the end of 1988, Hyper had sold all of the lots it had obtained in 1984 from Blue View. This left Blue View with its landlocked, unbuildable Parcel A; no opportunity to access the existing street by means of the Hyper lots; no agreement with the Loycanos or Marguerite with respect to transfer of the ten-foot strip that separated Blue View from the contemplated White Stone Road; and no progress toward implementation of the 1986 memorandum of understanding or the 1987 Populatic Heights subdivision plan. On July 11, 1991, Marguerite, Blue View's coventurer in the Populatic Heights project, entered bankruptcy.

After unsuccessful enforcement efforts, the town commenced an action in the Superior Court (no. 92-866) to obtain restoration of the site by Marguerite, the Loycanos, and Blue View. Blue View cross-claimed for restoration of the site and for compensation for damage to its own property by virtue of the unauthorized loam and gravel removal. The action generated an agreement for judgment dated September 27, 1995, between the town and the Loycanos whereby the Loycanos would submit a new plan of subdivision for their own land and, if the plan were approved, construct promptly and make payments to the town from the proceeds derived from sales of the subdivision lots. Blue View was not a party to the agreement, which left Blue View's land unrestored; White Stone Road, as previously planned, unconstructed; and Blue View not a participant in the Loycanos' subdivision project. Eventually, in 1998, Blue View's cross-claim for damages for unauthorized removal of loam and gravel from its land came to trial, and Blue View obtained a jury verdict in the amount of $17,565.

In the fall of 1995, Blue View borrowed $70,000 from Theodore Ranieri, a friend and business associate of Chilson,

and the principal of Ranieri Corporation. The loan was secured by a mortgage on Blue View's property, described in the mortgage as lots A-G, as shown on the plan for the Populatic Heights subdivision. On November 25, 1997, Ranieri made a second loan to Blue View in the amount of $60,000, again receiving a mortgage on the same premises. On December 31, 1999, Ranieri Corporation made a mortgage loan to Blue View, this time in the amount of $100,000. Some of the money loaned was apparently used by Chilson for personal expenses. By the time of trial, Blue View had made no payments on any of the loans, and Ranieri had made no efforts to collect or to foreclose on the mortgages. Ranieri testified that he considered the loans a "business investment," and that he expected to be repaid when Blue View developed and sold its property. Ranieri has paid real estate taxes on the property, as well as attorney's fees in this litigation.

On December 29, 1995, Blue View commenced its own action in the Superior Court (no. 95-2785) to compel the town to enforce the zoning by-law by ordering the Loycanos and Marguerite to restore Blue View's land. The action was consolidated with the still extant civil action no. 92-866 (in which the agreement between the town and the Loycanos had not been reduced to a final judgment, presumably because Blue View's cross-claim remained pending).

On January 19, 1996, the Loycanos' new developer, Glynn Homes, Inc., filed a plan of subdivision of the Loycanos' land contemplating creation of a development to be called Brandywine Village. The planning board took no action on the proposal.[5] On May 27, 1997, the town and the Loycanos replaced their agreement for judgment in the pending Superior Court cases with a new agreement that called for resubmission of the Brandywine Village plan to the planning board and, once approval was obtained, expeditious construction and payments to the town from sales proceeds. As before, the plan did not provide for restoration of Blue View's land or for construction of White Stone Road. In June, 1998, Blue View obtained its verdict of $17,565 in damages on its cross claim, and on June 11, 1999,

---

[5]Chilson was a member of the planning board at this time.

the Land Court ruled that the Brandywine Village plan had been constructively approved effective July 29, 1996.

On August 4, 1999, the planning board rescinded the constructive approval of the Brandywine Village plan.[6] Final judgments in the consolidated Superior Court cases entered on October 18, 2001. Blue View appealed, but its appeal was dismissed by this court on January 30, 2004, for failure to prosecute. On November 27, 2001, Marinella agreed to purchase the Loycanos' property.[7] Marinella filed with the planning board a request to modify the Populatic Heights subdivision plan of 1987 so that the properties would be regraded to repair the effects of the excessive removal of loam and gravel, White Stone Road would be constructed (without cost to Blue View), and Blue View would be given access to White Stone Road sufficient to support seven buildable lots. Despite being offered everything he had sought with respect to the development of Blue View's property, Chilson opposed the modification, the town planner recommended denial, and Marinella withdrew the application. Chilson then approached Joseph Loycano, offered him what appeared to be a below-market price for his land (which Loycano declined), then threatened that, absent a sale, he would tie up Loycano's development efforts indefinitely.[8]

On December 6, 2001, Blue View commenced the present action. On March 26, 2002, Marinella and the Loycanos applied to the town's zoning board of appeals for a comprehensive permit, see G. L. c. 40B, to authorize construction of ninety-two housing units on the Loycanos' property (the project to be called Brandywine Village).[9] The zoning board of appeals did not act on the application within thirty days. See G. L. c. 40B, § 21.

---

[6]Chilson, still a member of the planning board, abstained from the vote.

[7]The Loycanos' previous developer, Glynn Homes, Inc., by this time had apparently had enough.

[8]The judge also found that, on other occasions, Chilson had threatened Joseph Loycano that, if he did not convey his land to Blue View, Chilson would obstruct Loycano's efforts to develop the property.

[9]The plan called for construction of a way to be called Brandywine Road that would provide access to Blue View's land sufficient to support two buildable lots. Assuming the issuance of required construction permits, Blue View could also remove and sell nearly $1 million worth of gravel. In a subsequent proceeding before the town conservation commission, Ranieri spoke against the project.

Marinella purchased the property on April 16, 2003, thus removing the Loycanos as parties in interest. Although Marinella asserted that the application had been constructively approved by virtue of the zoning board's inaction, it eventually resolved the issue by agreeing to, and in 2004 receiving approval of, a scaled-back project of sixty-four housing units. Blue View did not challenge the approval. On November 29, 2004, Blue View's claims of a constructive taking by the town and an easement by estoppel over Marinella's land were reached for a jury-waived trial. It is Blue View's appeal from the judgment against it that is now before us.

2. *Constructive taking.* Blue View asserts that it is entitled to damages for a constructive taking by virtue of the protection accorded to approved subdivision plans by G. L. c. 41, § 81W. That section authorizes a planning board to modify, amend, or rescind approval (including constructive approval) of a subdivision plan, or to require changes in the plan as a condition to retaining the plan's approved status. However, the second paragraph of G. L. c. 41, § 81W, as appearing in St. 1977, c. 473, provides that "[n]o modification, amendment or rescission of the approval of a plan of a subdivision or changes in such plan shall affect the lots in such subdivision which have been sold or mortgaged in good faith and for a valuable consideration subsequent to the approval of the plan, or any rights appurtenant thereto, without the consent of the owner of such lots, and of the holder of the mortgage or mortgages, if any, thereon." The statute thus protects the reasonable expectations of those who acquire real estate, or interests therein, which is governed by an approved subdivision plan on which those purchasers presumably relied.

A violation of G. L. c. 41, § 81W, is treated as if there has been a taking of the property interest, in whole or in part, and entitles the owner to damages accordingly. Thus, it is provided in G. L. c. 41, § 81DD, inserted by St. 1953, c. 674, § 7, that "any person injured in his property by reason of the modification, amendment or rescission of the approval of a plan under section eighty-one W without his consent in writing . . . may recover the damages so caused under chapter seventy-nine [which provides for damages in eminent domain proceedings]." Damages are awarded only "to the extent that [such person] shall

have changed his position or made expenditures in reliance upon such approval." *Ibid.*

Blue View's claim of rights under G. L. c. 41, §§ 81W and 81DD, is premised on the approval by the planning board in 1987 of the Populatic Heights subdivision plan that Blue View submitted in conjunction with Marguerite. With this approval in place, Blue View's argument continues, Blue View conveyed to Ranieri or Ranieri Corporation mortgage interests in its portion of the land subject to the approved plan in 1995, 1997, and 1999. Accordingly, Blue View asserts, the approval could not be altered or rescinded without the written agreement of Blue View and its lender. Blue View then argues that the approval by the zoning board of appeals in 2004 of Marinella's application under G. L. c. 40B to construct Brandywine Village effectively rescinded the Populatic Heights subdivision plan without the agreement of an owner or mortgagee, and therefore constituted a constructive taking entitling Blue View to damages under G. L. c. 41, § 81DD. The judge correctly rejected the proposition.

At the outset, it appears to us that the Populatic Heights plan of subdivision had been abandoned not later than 2002. That plan was submitted in 1987 by Blue View and Marguerite, was approved, and subsequently generated not development, but rather earth removal and law suits. Marguerite, the Loycanos' developer, disappeared into the bankruptcy court, and was eventually succeeded by Marinella. On March 26, 2002, the Loycanos and Marinella filed the G. L. c. 40B application that was ultimately approved on a reduced scale. By this date, Blue View's coventurers in the Populatic Heights project (the Loycanos) had effectively given up on it, and they and their new developer (Marinella) started on a course that would remove from the Populatic Heights proposed development a significant portion of the real estate on which the development was to take place. Thus, the approved plan of the Populatic Heights subdivision of 1987 could never be implemented and had effectively been withdrawn. Whatever rights Blue View might have against the Loycanos in the circumstances, the town could not be precluded from authorizing alternative development plans because of a fifteen-year-old approval of a proposal that could never come to fruition.

Passing the abandonment of the approved plan, and treating the Populatic Heights plan as still in place, we agree with the judge that G. L. c. 41, § 81W, is inapplicable. We are not persuaded by Blue View's argument that the absence of an express reference in the second paragraph of the statute to a modification, amendment, or rescission of the approval *by a planning board* means that action by any municipal agency (such as the zoning board of appeals in this case) may entitle an owner to damages. The entire section is devoted to planning boards and their powers. It is the planning board that is authorized in the first paragraph to modify, amend, or rescind an approved plan, and it is clear that the second paragraph is intended to limit the circumstances in which the planning board may exercise that authority. We conclude that § 81W has no effect on a zoning board of appeals and in no way limits that board's authority under G. L. c. 40B.

We move on to observe that, even were G. L. c. 41, §§ 81W and 81DD, applicable, Blue View has not established a right to recover. Under § 81W, second par., a modification, amendment, or rescission must "affect the lots" in the previously approved subdivision. We have held that "the plan modifications which the Legislature sought to guard against when it used the verb 'affect' were those which impaired the marketability of titles acquired by bona fide purchasers from subdividers." *Patelle* v. *Planning Bd. of Woburn*, 20 Mass. App. Ct. 279, 282 (1985). Here, the approval by the zoning board of appeals of Marinella's application under G. L. c. 40B does not even involve Blue View's property, and cannot be seen as affecting any title interests of the owner or mortgagee.

Furthermore, the judge's finding that Blue View's property was not mortgaged in good faith is plainly warranted. Ranieri's loans to Blue View totaled $230,000 in slightly more than four years. Blue View paid nothing in return and Ranieri made no effort to collect. Ranieri himself described the loans as a business investment, a characterization supported by his payment of real estate taxes on Blue View's property as well as by his funding of this litigation. Given that Ranieri was essentially Blue View's partner rather than its lender, the judge could permissibly find that the mortgages were given not to secure genuine

loans made in good faith, but rather for the purpose of preventing the planning board from altering the 1987 Populatic Heights plan. Consequently, Blue View obtained no rights under G. L. c. 41, § 81W.[10]

Nor, even had Blue View given the mortgages in good faith, has it satisfied the requirement of G. L. c. 41, § 81DD, that it have changed its position or incurred expense in reliance on approval of the 1987 plan. That Blue View's Parcel A was landlocked was self-inflicted. Blue View had sold the portion of its land that provided frontage to Hyper approximately two and one-half years before the Populatic Heights proposal was submitted to the planning board. The judge was not required to credit Chilson's claim that he had an agreement with Hyper that he could build a road through one of Hyper's lots, particularly given the testimony of one of Hyper's principals that no such agreement existed. In addition, even with the approved Populatic Heights plan in place, Parcel A still lacked frontage because of the intervening ten-foot strip that separated it from the location of the proposed White Stone Road.

That Blue View had not genuinely changed any position in reliance on the approved Populatic Heights plan is probably best demonstrated by the fact that Chilson rejected proposals by Marinella that would have given Blue View everything it had been seeking for fifteen years, a powerful indication that Blue View's objectives could only be satisfied by a cheap acquisition of the Loycano land. On any or all of the above considerations, Blue View was not entitled to relief under G. L. c. 41, §§ 81W and 81DD.

3. *Easement by estoppel.* Blue View asserts separately that, in any event, the circumstances have created an easement by estoppel in its favor so that it can cross Marinella's land in order to provide frontage for Parcel A. Blue View claims in this regard that, in reasonable reliance on the representations of the Loycanos, Marinella's predecessor in title, and their developer Mar-

---

[10]To the extent that Blue View relies on Eliades *vs.* Callahan, Land Court, Nos. 287351 & 290121 (May 6, 2005), to support its assertion that the mortgages in question were given in good faith, that decision (which is not binding on us in any event) has been questioned in *Eliades* v. *Planning Bd. of Ayer*, 67 Mass. App. Ct. 1110 (2006).

guerite, Blue View changed its position to its detriment by ceasing its efforts to develop its own acreage; by permitting Hyper to sell lots that could have provided access to Parcel A; and by permitting Marguerite to remove ground materials from its property. We agree again with the disposition of the trial judge.

Blue View relies on general estoppel principles in attempting to make its case. We have held, however, that such principles do not apply to the creation of easements. In *Patel* v. *Planning Bd. of N. Andover*, 27 Mass. App. Ct. 477, 481-482 (1989), we noted that an easement may be created by estoppel in two ways. First, when a grantor conveys land bounded by a street or way, he, and those claiming under him, are estopped to deny the existence of the street or way, and his grantee acquires rights in the entire length of the street or way as then laid out or clearly prescribed. See *Casella* v. *Sneierson*, 325 Mass. 85, 89 (1949). Second, when a grantor conveys land situated on a street in accordance with a recorded plan that shows the street, the grantor, and those claiming under him, are estopped to deny the existence of the street for the distance as shown on the plan. See *Goldstein* v. *Beal*, 317 Mass. 750, 755 (1945).

Thus, in each of those instances, easements by estoppel arise by virtue of the conveyance made by the grantor to the grantee. "Both categories of cases deal with the rights of grantees or their successors in title against their grantors and their successors in title." *Patel* v. *Planning Bd. of N. Andover*, *supra* at 482. We went on to state that "[w]e are aware of no case in Massachusetts recognizing the creation of an easement on broader principles of estoppel." *Ibid.*

Blue View rejects these limitations, and in fact cites the *Patel* decision, *supra*, as authority for the proposition that ordinary estoppel principles apply. This is a misreading of that decision. After stating expressly that no Massachusetts case had recognized an easement by estoppel in circumstances other than those described, the court referred to the fact that some States have applied general estoppel principles, but that, even if such a doctrine were to be adopted, it would have to be narrowly applied. *Ibid.* We see nothing in this language that alters the basic statement of Massachusetts law on the subject. Nor are we prepared to abandon these restrictions at the urging of certain com-

mentators. We are not persuaded that there are changed circumstances that warrant alteration of the development of the common law with respect to such easements.

We observe as well that, even if general estoppel principles applied to the creation of easements, Blue View still would not qualify for relief on this record. For the reasons stated in connection with Blue View's claim under G. L. c. 41, §§ 81W and 81DD, evidence that Blue View altered its position to its detriment in reasonable reliance on the Populatic Heights plan of subdivision is not persuasive, particularly where Blue View rejected a reasonable proposal to provide the access that it was seeking. We also have considerable doubt that, given the judge's findings, Blue View would survive a defense of the absence of clean hands.[11]

4. *Attorney's fees.* Marinella has submitted a request that it be awarded attorney's fees on appeal. While Blue View has not prevailed, we do not consider that its prosecution of the appeal was frivolous, and Marinella's request for fees is denied.

*Judgment affirmed.*

---

[11]In light of our disposition of Blue View's claims on the merits, it is not necessary to address Marinella's contention that those claims are barred by res judicata, waiver, laches, and estoppel.